759 So.2d 23 (2000)
Armond PASQUALE, Appellant,
v.
FLORIDA ELECTIONS COMMISSION, Appellee.
No. 4D99-1145.
District Court of Appeal of Florida, Fourth District.
March 22, 2000.
Rehearing Denied June 14, 2000.
*24 Harriet Rae Freeman, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, and John J. Rimes, III, Assistant Attorney General, Tallahassee, for appellee.
KLEIN, J.
Appellant, who was the treasurer for his wife, was fined $500 by the Florida Elections Commission for failing to report in-kind contributions to her political campaign. The contributions were in the form of a newsletter containing news about city government which was printed by a citizen and which endorsed appellant's wife and other candidates for seats on the Stuart City Commission. We reverse in part and affirm in part.
Following an election in 1995, a number of citizens in Stuart, including the Pasquales and a Mr. Carroll, formed a discussion group about city government. Mr. Carroll then began printing a newsletter about city government. He paid for all costs of producing the newsletter, and he and others would distribute the newsletter to the public by placing copies in plastic bags and leaving them on the lawns of homeowners.
One of Mr. Carroll's newsletters published shortly before the 1996 elections for the Stuart City Commission contained editorial endorsements of Mrs. Pasquale and other candidates. A number of copies of the issue were given to Mrs. Pasquale free of charge, and Mr. Pasquale was observed distributing some of these copies. Mr. Carroll testified that if Mr. Pasquale did distribute copies it was not on behalf of Mr. Carroll.
As a result of a complaint filed by Mr. Rifkin, the husband of Mrs. Pasquale's opponent in the election, the Florida Elections Commission issued an order of probable cause charging Mr. Pasquale with violating section 106.19(1)(b), Florida Statutes (1995), which requires "contributions" to be reported and section 106.07(5), Florida Statutes, which prohibits the certification *25 of an incorrect campaign treasurer's report.
A contribution which must be reported under section 106.19(1)(b) is defined in section 106.011(3) as:
A gift, subscription, conveyance, deposit, loan, payment, or distribution of money or anything of value, including contributions in kind having an attributable monetary value in any form....
Notwithstanding the foregoing meanings of "contribution," the word shall not be construed to include services, including, but not limited to, legal and accounting services, provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate or political committee. This definition shall not be construed to include editorial endorsements. [Emphasis supplied.]
It was the position of the FEC that Mr. Pasquale had violated the law in two respects: (1) the copies of the newsletter given Mrs. Pasquale had value which should have been reported as a contribution; and (2) the endorsement in the newsletter was not exempt as an editorial endorsement and therefore had value in and of itself which had to be reported.
The administrative law judge (ALJ) concluded that this was an editorial endorsement excluded by section 106.011(3) and thus found no violation in that regard. He did conclude, however, that by failing to report the value of the copies of the newsletter given to Mrs. Pasquale, Mr. Pasquale had violated section 106.19(1)(b), which requires the reporting of "any contribution" and section 106.07(5) which requires campaign treasurers to accurately report contributions. The ALJ recommended that Mr. Pasquale be fined $500.
Both Mr. Pasquale and the Commission filed exceptions. The Commission adopted the recommendation of the ALJ that Mr. Pasquale had violated section 106.19(1)(b), because the copies produced by Mr. Carroll constituted something "of value" under section 106.011(3)(a), and Mr. Pasquale appeals.
We agree with the Commission that the receipt of the copies had to be reported. If Mrs. Pasquale had obtained only one copy of the newsletter and had to print the additional copies herself, that would have resulted in an expense to her campaign. Her campaign did not have to bear that expense because Mr. Carroll contributed the copies to the campaign. They were accordingly something "of value."
Mr. Pasquale argues in his brief that copies of the newsletter were distributed to the public at no cost and that he could have obtained the copies he distributed merely by picking them up at a place where they had been left for the public to take them. That is not what occurred, however, in this case. Neither of the Pasquales testified, but the evidence reflected that Mr. Carroll printed a larger than normal number of copies of the issue containing the editorial endorsement of Mrs. Pasquale and free copies were furnished to Mrs. Pasquale's campaign for the purpose of helping her get elected.
Nor can we agree with Mr. Pasquale that the violation was not willful. Willfulness is defined in section 106.37 as knowing or showing reckless disregard. Although, under other circumstances, omitting to report the receipt of the copies of this free newsletter could amount to no more than neglect, Mr. Pasquale was a campaign treasurer and had signed a statement certifying that he understood Chapter 106. In addition the citizens' group which included the Pasquales had a lawyer advise them about what they could and could not do politically. There is accordingly competent substantial evidence to support the finding of a willful violation under the specific facts of this case.
As to the editorial endorsement itself, the Commission disagreed with the ALJ on the issue of whether the recommendation in the newsletter was exempt. *26 The Commission relied on a different part of the statute, section § 106.011(17), which defines "political advertisement" and excludes "editorial endorsements by any newspaper, radio or television station, or other recognized news medium." The Commission applied the "recognized news medium" language in the political advertisement section of the statute so as to narrow the exclusion in the definition of contributions, which simply excludes all "editorial endorsements." Utilizing that narrower definition, the Commission then concluded that Mr. Carroll's newsletter was not "any newspaper, radio or television station, or other recognized news medium."
The Commission's use of the "recognized news medium" language in one section of the statute, in order to interpret a different section of the statute which does not contain that language, runs afoul of Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 914 (1995), in which our supreme court stated:
When the legislature has used a term, as it has here, in one section of the statute but omits it in another section of the same statute, we will not imply it where it has been excluded.
It would have been a simple matter for the legislature to have worded the exclusions for editorial endorsements identically, but it did not. This differentiation must be assumed to be intentional. Myers v. Hawkins, 362 So.2d 926 (Fla.1978). Our lenity statute, section 775.021(1), provides that "offenses" defined by any Florida statutes must be construed most favorably to the offender if the language is susceptible of different meanings. Accordingly, any ambiguity in the meaning of "editorial endorsement" in this penal statute must be construed in favor of Mr. Pasquale. Whitaker v. Department of Ins., 680 So.2d 528 (Fla. 1st DCA 1996). Applying that principle we agree with Mr. Pasquale that the recommendation in the newsletter was an "editorial endorsement," under section 106.011(3)(a), and that there was no violation in that regard.
As we noted earlier, the ALJ had recommended that Mr. Pasquale be fined $500 for the one violation. Even though the Commission determined that there were two violations, it did not increase the penalty, stating that the fine for failing to report the value of the free copies was "sufficient in light of the facts of this case." We affirm the fine, but only for the violation involving the failure to report the value of the copies of the newsletter received by the campaign.
STEVENSON, J., concurs.
FARMER, J., dissents with opinion.
FARMER, J., dissenting.
Carroll published and appellant distributed materials whose principal purpose was to influence the way people vote in municipal elections. The activities in which appellant was engaged are thus at the very nucleus of the core of what is protected by the First Amendment.
"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order `to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Although First Amendment protections are not confined to `the exposition of ideas,' `there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, ... of course includ[ing] discussions of candidates....`" [c.o.]
Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also McIntyre v. Ohio Elections Comm., 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Or, to put it more aptly for this case, "handing out leaflets in the advocacy *27 of a politically controversial viewpoint... is the essence of First Amendment expression." McIntyre, 514 U.S. at 347, 115 S.Ct. 1511. We are therefore compelled to apply the United States Supreme Court decisions holding that laws burdening core political speech must be subjected to exacting scrutiny. See, e.g., McIntyre, 514 U.S. at 347, 115 S.Ct. 1511; First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 776-777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).
Applying these principles, I obviously concur with our holding today that the recommendation in the paper was an "editorial endorsement" and thus exempt from the reporting requirements of section 106.07 and that the Commission erred in reversing the ALJ's finding of exemption. It would pervert our history of a free press to suggest that the endorsement of Pasquale's candidate in Carroll's paper was not an "editorial endorsement", which is categorically excluded from the definition of "political advertisement" in the same definitional statute. Although Carroll's paper was not like the more familiar newspapers in wide circulation throughout the area, surely it could claim to be a "recognized news medium" within the meaning of the statute. Indeed the press in Colonial times was often exactly like Mr. Carroll's little paper here, a writing of only a single or few pages, freely given within a relatively small area of political concern. In fact, if the legislature had sought by explicit text to limit the protection to only such newspapers, and thereby exclude smaller papers with fewer readers, I doubt that it would pass muster under Buckley because of an impermissible under-inclusivity. And so I happily join in reading the text we have to cover this journal of Carroll's.
I part company with the majority, however, as regards the reporting of the papers as "[some]thing of value ... having an attributable monetary value." § 106.011(3), Fla. Stat. (1999). This statutory text plainly does not apply to these free distributions of Carroll's paper. Quite to the contrary, the statute expressly requires that these papers have an attributable monetary value to be deemed contributions in kind. The facts clearly negate any "attributable monetary value" because Carroll never charged anyone for them, at any time. If something is free to everyonei.e., if it can be had without paying anyone any money to obtain itit is hard for me to understand how one can attribute to it a monetary value. It might have any manner of other values, but not a monetary one.
The materials[1] involved in this case were always given away; they were never sold. The record does not show, as implied by the majority, that it was only appellant who got them free of charge. While the number given away fluctuated over the short period involved here, and the distribution of increased numbers did coincide with the election, no one offered any evidence that these papers had any intrinsic monetary value because of, say, their cost at retail stands. They had no cost at retail stands. Thus the attempt to equate these free handouts with gratuitous copies of newspapers in wider circulation e.g., The Miami Herald, The Stuart News or The Palm Beach Postis quite invalid.
In spite of these facts and the constitutional principles mentioned above, the majority liberally construes the words "anything of value, including contributions in kind having an attributable monetary value" from section 106.011(3) to extend to *28 the free copies of Carroll's publication that appellant distributed. I cannot agree with this broad construction. While I do agree that this statutory locution is not void as being intolerably vague, I cannot accept the argument that "anything of value" was meant to include something that is free to start with, unlike a newstand copy of The Stuart News or The Palm Beach Post, which costs everyone half a dollar.
To invest Carroll's papers with monetary value simply because they may have given some intangible aid to Pasquale's campaign is to extend the meaning of this regulatory statute away from its text to something its drafters have not said. That, it seems to me, is entirely contrary to Supreme Court jurisprudence in this area. If I understand these Supreme Court decisions to do anything, they make it clear that statutes affecting core political speech must set out in specific terms free from doubt what is being regulated.
I therefore dissent from the decision of the majority to uphold the fine for failing to report the free papers as something of value to appellant's candidate. I would exonerate him entirely.
NOTES
[1] The FEC quarrels with the characterization of Carroll's publication as a newspaper. It matters little whether it is called a newspaper, a journal, a letter, a broadsideor, for that matter, a McGuffin. From a functional perspective this publication occupies a role identical to that of a newspaper, newsletter, broadside or other traditional medium of information and persuasion.