842 So.2d 77 (2003)
Inquiry Concerning a Judge, No. 99-09, re Patricia KINSEY.
No. SC96629.
Supreme Court of Florida.
January 30, 2003.
Rehearing Denied March 26, 2003.
*79 The Honorable Harvey L. Goldstein, Chairman, Hearing Panel, Florida Judicial Qualifications Commission and John R. Beranek, Counsel to the Hearing Panel, Tallahassee, FL; Thomas C. MacDonald, Jr., General Counsel, Florida Judicial Qualifications Commission, Marvin E. Barkin and Michael K. Green of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, Special Counsel and Lansing C. Scriven, Co-Special Counsel, Tampa, FL, for Petitioner.
Roy M. Kinsey of Kinsey, Troxel, Johnson & Walborsky, Pensacola, FL, for Judge Patricia A. Kinsey, Respondent.
PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission ("JQC") that Judge Patricia Kinsey be disciplined. We have jurisdiction. See art. V, § 12, Fla. Const.

CHARGES
This case arose out of charges brought against Judge Kinsey alleging that she engaged in a pattern of improper conduct *80 during the course of her 1998 election campaign for the office of County Court Judge for Escambia County. Formal proceedings were officially instituted against Judge Kinsey on September 9, 1999, when she was initially charged with eleven ethical violations, all based upon conduct occurring during her election campaign. These charges were amended on March 8, 2000, to include an additional allegation which related to a radio advertisement that was aired during the campaign. A hearing was held before the JQC on June 12-13, 2000, at which time the campaign brochures and radio excerpts were the primary evidence used to support the charges. The JQC found Judge Kinsey guilty or guilty in part of nine ethical violations:
CHARGE:
1. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(5), Canon 7A(3)(a), and Canons 7A(3)(d)(i)(ii), you distributed a piece of campaign literature entitled, "Pat Kinsey: The Unanimous Choice of Law Enforcement For County Judge" in which you stated that "police officers expect judges to take their testimony seriously and to help law enforcement by putting criminals where they belong ... behind bars," as opposed to simply pledging or promising the faithful and impartial performance of your duties in office....
PANEL FINDING:
1. Guilty as charged.
CHARGE:
2. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(5), Canon 7A(3)(a), and Canons 7A(3)(d)(i)(ii), you reiterated your commitment to the prosecution side of criminal cases by distributing a piece of campaign literature entitled, "If You Are a Criminal, You Probably Won't Want to Read This," in which you stated that "police officers expect judges to take their testimony seriously and to help law enforcement by putting criminals where they belong ... behind bars!,["] as opposed to simply pledging or promising the faithful and impartial performance of your duties in office....
PANEL FINDING:
2. Guilty as charged.
CHARGE:
3. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(5), Canon 7A(3)(a), and Canons 7A(3)(d)(i)(ii), you distributed a similar piece of campaign literature entitled, "Let's Elect `Pat' Kinsey for County Judge," in which you reiterated that "a judge should protect victims' rights," and that judges must support "hard-working law enforcement officers by putting criminals behind bars, not back on our streets," as opposed to simply pledging or promising the faithful and impartial performance of your duties in office.... At a minimum, statements of the nature of those identified in paragraphs 1, 2, and 3 erode public confidence in the integrity and impartiality of the judiciary and commit or appear to commit you with respect to issues that may come before the court.
PANEL FINDING:
3. Guilty as charged.
CHARGE:
4. During the campaign, in violation of Canon 1, Canon 2A, Canon 7A(3)(a), and Canons 7A(3)(d)(i)-(ii), you made statements during an interview on a local radio station which exhibited a hostility or apparent hostility towards defendants in criminal cases. By way of *81 example, the following colloquy occurred between you and a caller to the radio show on which you appeared:
Caller: [M]y question is mainly pertained to Pat Kinsey. Do you believe that as a Judge, you would be able to stand up there, umm, because I do know that you are pro-law-enforcement, to be able to make a decision without any bias towards the defense or prosecution?
* * *
Pat Kinsey: As a prosecutor, I am different from a defense attorney. I am trained, and I am ethically obliged to look at a case, after an arrest has been made and make a determination, what is just? What is fair? What are the appropriate charges? ... This is something that is much different from what a defense attorney does. Much like Bill Green before he went on the bench, he was a defense attorney, that type of attorney. He is trained, and he is ethically obliged at that time to zealously advocate for his client. That is, do whatever he could, under the law, to get his client free. And that is why I think we have such a philosophical difference, between us. I think, in my opinion, that Judge Green is still in that defense mode. (emphasis added)
As evidenced by the caller's belief that you were "pro-law enforcement" coupled with: your (i) failure to disavow the caller of your apparent bias towards law enforcement; and (ii) attempt to portray the incumbent as "still in that defense-mode," you left the firm and definite impression that, as a judicial officer, you would be in a "prosecution mode" and not rule in an even-handed and impartial manner....
PANEL FINDING:
4. Not guilty as to "failure to disavow" but otherwise guilty as charged.
CHARGE:
5. During the campaign and in violation of Canon 1, Canon 2A, Canon 7A(3)(a), and Canons 7A(3)(d)(i)-(ii), you made the deliberate attempt to cloak your candidacy in an umbrella of law enforcement and portray yourself as a "pro-prosecution/pro-law enforcement judge" by:
disseminating a brochure entitled "Pat Kinsey: The Unanimous Choice of Law Enforcement for County Judge," ... in which you are shown in a group photograph with ten law enforcement officers;
stating in a brochure entitled "A Vital Message From Law Enforcement,"... that "victims have a right to expect judges to protect them by denying bond to potentially dangerous offenders" rather than stating that you would consider bond determinations fairly and impartially based on the circumstances of the particular case (emphasis added);
pledging in a brochure entitled "The Alternative for County Judge," ... that you would "bend over backward to ensure that honest, law-abiding citizens are not victimized a second time by the legal system that is supposed to protect them" (emphasis added);
highlighting in several of your campaign brochures that you had the "unanimous support of law enforcement" and that "area police officers [had] unanimously endorsed Pat Kinsey for County Judge," thereby further reinforcing your alliance with law enforcement;
emphasizing in a brochure entitled "If You Are a Criminal, You Probably *82 Won't Want to Read This," ... that "Above all else, Pat Kinsey identifies with the victims of crime," and that "Pat Kinsey believes a judge should protect the victims of crime," rather than simply pledging the faithful and impartial performance of your duties without regard to holding defendants' or victims' interests of paramount importance (emphasis added);
stating during the aforementioned radio interview referenced in paragraph 4 hereof:
[you] work[ed] very closely with law enforcement officers as a prosecutor. And they're left begging for help. And all they see when they come to court is a judge, like Bill Green, who either dismisses a case or minimizes it by not holding the criminals accountable.... Somebody has to hold these criminals accountable. And that is why I am here.
further commenting during the same radio interview that:
I very much take exception to the fact that Mr. Green says he's not a Liberal. He very definitely is. And his record will show that. In fact, I invite you to talk with the law enforcement officers who have endorsed me unanimously.... Look to see who they are supporting. Look to see who's [sic] campaign they are contributing to. And I think that will tell the story.
referring to the defendant as a "punk" in your campaign brochure entitled "A Shocking Story of Judicial Abuse," ... thereby evidencing a certain hostility or bias towards defendants generally.
PANEL FINDING:
5. Guilty as charged of cloaking her entire candidacy in the umbrella of law enforcement and portraying herself as a future pro-prosecution/pro-law enforcement judge while characterizing her opponent as dismissing criminals and not holding them accountable. The charge contains 8 different examples of similar conduct and these examples represent the basic theme of the entire judicial campaign by Judge Kinsey.
CHARGE:
6. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(9), Canon 7A(3)(a), and Canons 7A(3)(d)(i)(iii), you knowingly misrepresented in your campaign brochure entitled, "A Vital Message From Law Enforcement," the record facts concerning the defendant's appearance before the incumbent for bond consideration in State v. Alsdorf, Case No. 98-2993, including the false statement that the defendant had been "released ... into our community," when, in fact, the defendant had not been released into the community....
PANEL FINDING:
6. Judge Kinsey is found not guilty of this specific charge. The charge is based on JQC Exhibit 4, where Kinsey was accused of "knowingly" making "the false statement that the defendant" (Alsdorf) "had been released into our community...." Although Kinsey is found not guilty of this particular allegation from JQC Exhibit 4, she is found guilty of other charges stemming from the same piece of campaign material.
CHARGE:
7. During the campaign, in violation of Canon 1, Canon 2A, Canon 7A(3)(a), and Canons 7A(3)(d)(i)-(iii), you knowingly misrepresented in your campaign brochure entitled "A Shocking Story of *83 Judicial Abuse," that your opponent, the incumbent, had not revoked Grover Heller's bond at an emergency bond hearing when, in fact, he had revoked the defendant's bond. You further implied that your opponent's role in that case was to protect "an elderly law-abiding couple" and that the incumbent's conduct represented a "shocking lack of compassion for the victims of violent crime."
PANEL FINDING:
7. Guilty in part. The Panel finds guilt on the first part of this charge in that candidate Kinsey made a knowing misrepresentation concerning the bond revocation but not guilty as to the charge of "implying" a shocking lack of compassion for the victims. This charge was based on Exhibit 6, "A Shocking Story of Judicial Abuse," which concerned Judge Green's rulings on the Grover Heller bond.
CHARGE:
8. During the campaign, in violation of Canon 1, Canon 2A, Canon 7A(3)(a), and Canons 7A(3)(d)(i)-(iii), you knowingly misrepresented in a radio advertisement the incumbent's role in the Grover Heller matter by omitting crucial facts relevant to an accurate portrayal of the incumbent's conduct and by giving listeners the false impression that the incumbent took no action to protect an elderly couple from domestic violence....
The radio advertisement stated as follows:
What kind of man would beat up his own mother? Meet Grover Heller. He was arrested for battery after he grabbed his 63-year-old mother, slammed her against a door and beat her with his fists, sending her to the hospital. Incredibly, County Judge William Green released this thug the very next day. The son then threatens to kill his parents. The frightened couple asked Judge Green to have their son arrested. What did Judge Green do? He offered to put the elderly couple in jail. You heard right.
Instead of jailing the abusive son, Judge Green offers to put the elderly parents in jail. When asked by reporters, why? [sic] Judge Green said he was testing them to see if they were really afraid. Since when does a law-abiding couple need to be tested by a county judge who is supposed to protect them. Sick of this kind of justice? Then vote no on Judge William Green, Tuesday, September 1st.
Paid political advertisement, paid for and approved by Patricia Kinsey, campaign nonpartisan.
PANEL FINDING:
8. Not guilty. Although the Panel finds Judge Kinsey guilty of other aspects of the Grover Heller matter under charge 7, the Panel concluded this separate charge concerning the same controversy should not be sustained as an additional charge. This was a 60 second radio spot and did not have to contain the full facts of the controversy.
CHARGE:
9. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(9), Canon 7A(3)(a), and Canons 7A(3)(d)(i)(iii), in your campaign brochure entitled "A Vital Message From Law Enforcement," you knowingly misrepresented the nature and seriousness of criminal charges which were pending in State v. Johnson, Case No. 97-4302, by giving the false and misleading impression that the defendant had been charged with *84 attempted murder and burglary at the time of his appearance for bond consideration when, in fact, no such charges were pending at the time. Your campaign literature also stated that in a restraining order in the case, the defendant is quoted as having told the victim that he would kill her "just like I buried that bitch in Mississippi," when, in fact, there is no such language in the restraining order....
PANEL FINDING:
9. Guilty of making a knowing misrepresentation as to the seriousness of the criminal charges which were pending in State v. Johnson. Not guilty as to the quoted matter attributed to the defendant in the latter part of this charge. This language came from a bond hearing rather than from a restraining order but the Hearing Panel does not find this to have been a knowing misrepresentation.
CHARGE:
10. During the campaign, in violation of Canon 1, Canon 2A, Canon 3B(5), Canon 3B(9), [and] Canon 7A(3)(d)(ii), in your campaign brochure entitled "A Vital Message From Law Enforcement," you publicized the details of the pending cases of two criminal defendants, Stephen Johnson and Gerald Alsdorf, to the public in a manner that could affect the outcome or impair the fairness and integrity of those proceedings....
PANEL FINDING:
10. Guilty as charged.
CHARGE:
11. During the campaign, in violation of Canon 1, Canon 2A, Canon 7A(3)(a), and Canon 7A(3)(d)(iii), in your campaign brochure entitled "A Vital Message From Law Enforcement," you knowingly misrepresented the incumbent as Judge "Let `em Go" Green, who consistently ignored the pleas of police officers, prosecutors and victims to keep potentially dangerous individuals off the streets....
PANEL FINDING:
11. Not guilty. Although use of "Let `Em Go Green" was inappropriate in the view of the Hearing Panel, there was unrebutted evidence that this nickname was commonly used by law enforcement members in regard to Judge Green. The Panel also notes that although available, the former Judge Green was not called to testify by the Investigative Panel. There was no evidence offered to rebut Judge Kinsey's assertions of Judge Green's inappropriate conduct in his criminal cases.
CHARGE:
12. During the campaign, in violation of Canon 1, Canon 2A, and Canon 7A(3)(a), you engaged in conduct unbecoming a candidate for and lacking the dignity appropriate to judicial office, which had the effect of bringing the judiciary into disrepute, by disseminating the statements set forth in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11, and affirmatively conveying the message that it is permissible for judges to rule in a predisposed manner in certain types of matters which may come before them. Such statements inappropriately attack the judicial system by conveying the false and misleading impression that a judge's role is to combat crime rather than judge those who appear before the court as criminal defendants in a fair and impartial manner. Moreover, by the breadth of your unsubstantial [sic] criticism, you diminished the public perception of the impartiality, independence, *85 and proper responsibility of the judiciary.
PANEL FINDING:
12. Guilty as charged as to Charges 1, 2, 3, 4, 5, 7, 9, and 10. Not guilty as to Charges 6, 8, and 11.
While this Court gives the findings and recommendations of the JQC great weight,[1] "the ultimate power and responsibility in making a determination rests with this Court." Id. Accordingly, we review the findings to ensure that there is "clear and convincing evidence" to support the alleged ethical violationsa standard of proof which has been described as "more than a `preponderance of the evidence,' but the proof need not be `beyond and to the exclusion of a reasonable doubt.'" Id. (quoting In re LaMotte, 341 So.2d 513, 516 (Fla.1977)).

APPLICABLE LAW
As an initial assertion, Judge Kinsey posits that she should not be found guilty of violating Canon 1, Canon 2A, Canon 3B(5), and Canon 3B(9) because Canon 7 is the only canon applicable to the charges. We agree. The Code of Judicial Conduct governs the activities of all members of the judiciary, even those seeking to become members.[2] Canons 1, 2, and 3, however, are directed only to a judge and hence cannot constitute an independent violation as to a judicial candidate who is not yet a judge.[3] Canon 7, in contrast, clearly states that it is applicable to all candidates who are running for office, whether the candidate is currently an article V judge or not, thus applying the same election rules to both judges and candidates alike. Because all formal charges sustained by the JQC were also premised on alleged violations of Canon 7, which expressly applies to judicial candidates, this claim does not invalidate any of the nine charges that the hearing panel found Judge Kinsey had violated.[4]

First Amendment Challenge
Next, Kinsey asserts that her campaign speech is protected by the First Amendment and relies upon the recent case of Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). In White, Gregory Wersal attempted to run for a judicial position on the Minnesota Supreme Court and disseminated materials which were critical of prior Minnesota Supreme Court decisions on the issues of crime, welfare, and abortion. Based on this campaign material, Wersal was accused of violating Minnesota's judicial code which prohibited a candidate for judicial office from "announc[ing] his or her views on disputed legal or political issues." Minn.Code of Jud. Conduct, Canon 5(A)(3)(d)(i) (2000).[5] Fearing further *86 repercussions, Wersal withdrew from the election. Two years later, Wersal ran for the same office and attempted to discover whether the Lawyers Board would enforce the "announce clause" and, if so, what was prohibited. Although the Lawyers Board did state that it had constitutional concerns about the clause, it did not answer his questions as to what specifically was prohibited. Wersal then filed suit in federal court, challenging the constitutionality of the clause.
The United States Supreme Court in its review of the announce clause concluded that the clause prohibited "the candidate's mere statement of his current position, even if he does not bind himself to maintain that position after election." Id. at 2532. Because the regulations at issue restricted political speech, the Court applied the strict scrutiny test which requires that the canon at issue be "(1) narrowly tailored, to serve (2) a compelling state interest." Id. at 2534. The Court noted that in order to show that the clause was narrowly tailored, it must be demonstrated that it does not "unnecessarily circumscrib[e] protected expression." Id. at 2535 (quoting Brown v. Hartlage, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982)). Minnesota contended that its judicial canons were narrowly tailored to serve two compelling state interests: (1) preserving the impartiality of the state judiciary (which protected the due process rights of litigants); and (2) preserving the appearance of the impartiality of the state judiciary (which preserved public confidence in the judiciary). The Court found that Minnesota was rather vague by what it meant by "impartial," however, and found that a judge could still be impartial even though he or she had expressed his or her view on an issue. In its review, the Court noted that a sitting judge would have expressed his opinion on issues, either through prior written decisions or prior experience, but that these preconceived notions did not necessarily affect his impartiality because he would rule in the same manner on the same issue, no matter which litigant raised the issue:
We think it plain that the announce clause is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Indeed, the clause is barely tailored to serve that interest at all, inasmuch as it does not restrict speech for or against particular parties, but rather speech for or against particular issues. To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party. Any party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.
Id. at 2535-36 (some emphasis added). The Court also emphasized that the "announce clause" was separate and apart from the "pledges or promises clause," since Minnesota adopted a separate canon which prohibited a candidate from promising or pledging to act in a certain manner while on the bench. Based on these observations, the Court found that Minnesota did not fulfill its burden in showing that the "announce clause" was narrowly tailored, and hence found that the rule violated the First Amendment.
In contrast to White, Florida does not have an "announce clause" but instead *87 adopted a more narrow canon, which provides as follows:
A candidate for judicial office ... shall not:
(i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; [or]
(ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court....
Fla.Code Jud. Conduct, Canon 7A(3)(d)(i)(ii). The commentary to the canon stresses the concept that "a candidate should emphasize in any public statement the candidate's duty to uphold the law regardless of his or her personal views."[6]
It is beyond dispute that Canon 7A(3)(d)(i)-(ii) serves a compelling state interest in preserving the integrity of our judiciary and maintaining the public's confidence in an impartial judiciary.[7] A judicial candidate should not be encouraged to believe that the candidate can be elected to office by promising to act in a partisan manner by favoring a discrete group or class of citizens. Likewise, it would be inconsistent with our system of government if a judicial candidate could campaign on a platform that he or she would automatically give more credence to the testimony of certain witnesses or rule in a predetermined manner in a case which was heading to court.
In reviewing the "narrowly tailored" prong of the test, we conclude that the restraints are narrowly tailored to protect the state's compelling interests without unnecessarily prohibiting protected speech. As is clear from the canons and related commentary, a candidate may state his or her personal views, even on disputed issues. However, to ensure that the voters understand a judge's duty to uphold the constitution and laws of the state where the law differs from his or her personal belief, the commentary encourages candidates to stress that as judges, they will uphold the law.

Charges 1, 2, 3, and 5
During Judge Kinsey's judicial campaign, she distributed numerous pamphlets which depicted a very "pro-law enforcement" stance. In charge 1, Kinsey disseminated a brochure which showed a full-page picture of her standing with ten heavily armed police officers and was captioned "Who do these guys count on to back them up?" Within the flyer, she stated, "[Y]our police officers expect *88 judges to take their testimony seriously and to help law enforcement by putting criminals where they belong ... behind bars!"
Charge 2 is based upon another flyer entitled "If you are a criminal, you probably won't want to read this!" In this leaflet, she again stressed, "[Y]our police officers expect judges to take their testimony seriously and to help law enforcement by putting criminals where they belong... behind bars!" The brochure also declared, "Above all else, Pat Kinsey identifies with the victims of crime."
A brochure entitled "Let's Elect Pat Kinsey " is the basis behind charge 3. In this leaflet, she informed the voting public that she believes, "We must support our hard-working law enforcement officers by putting criminals behind bars, not back on our streets."
Charge 5, which is drawn from the six brochures and a radio interview, asserts that Judge Kinsey deliberately attempted to cloak her campaign "in an umbrella of law enforcement." In a flyer entitled "The Alternative for County Judge," she stated, "Pat Kinsey will support our valiant law enforcement officers ... not make their job harder." She also declared in this literature that, "Pat Kinsey will bend over backward to ensure that honest, law-abiding citizens are not victimized a second time by the legal system that is supposed to protect them." This charge also refers to statements in a brochure entitled "A Vital Message From Law Enforcement," which declared, "victims have a right to expect judges to protect them by denying bond to potentially dangerous offenders."
During oral argument, Judge Kinsey acknowledged that Canon 7 was violated by her statements that a judge should "help law enforcement by putting criminals where they belongbehind bars" and that she would "bend over backward" to protect victims. She contends, however, that this should be considered protected speech under the First Amendment.
Although some of these charges taken in isolation would not violate the judicial canons, taken together it becomes clear that Judge Kinsey was running on a platform which stressed her allegiance to police officers.[8] Each of the charges addressed above involved implicit pledges that if elected to office, Judge Kinsey would help law enforcement. Through these statements, Judge Kinsey fostered the distinct impression that she harbored a prosecutor's bias and police officers could expect more favorable treatment from her as she promised to support police officers and help them put criminals behind bars. She also made pledges to victims of crime, promising to bend over backward for them and stressing the point that she identified with them "above all else," thus giving the appearance that she was already committed to according them more favorable treatment than other parties appearing before her. By disseminating materials which promised a different treatment based on the identity of the person appearing before her, it is beyond question that these promises affect her appearance of impartiality and fitness as a judge. While our judicial code does not prohibit a candidate from discussing his or her philosophical beliefs, in the campaign literature at *89 issue Judge Kinsey pledged her support and promised favorable treatment for certain parties and witnesses who would be appearing before her (i.e., police and victims of crime). Criminal defendants and criminal defense lawyers could have a genuine concern that they will not be facing a fair and impartial tribunal. We do not find that these types of pledges and statements by a judicial candidate are protected by the First Amendment.

Charge 4
Charge 4 is founded on comments that Judge Kinsey made during a radio interview when a caller asked if she could be able to make a decision without any bias toward the defense or prosecution especially after considering that she appeared to be very "pro-law-enforcement." Judge Kinsey responded:
As a prosecutor, I am different from a defense attorney. I am trained, and I am ethically obliged to look at a case, after an arrest has been made and make a determination, what is just? What is fair? What are the appropriate charges? ... This is something that is much different from what a defense attorney does. Much like Bill Green before he went on the bench, he was a defense attorney, that type of attorney. He is trained, and he is ethically obliged at that time to zealously advocate for his client. That is, do whatever he could, under the law, to get his client free. And that is why I think we have such a philosophical difference, between us. I think, in my opinion, that Judge Green is still in that defense mode.
The JQC found that by answering the question in a manner which portrayed herself as a prosecutor and portrayed Judge Green as a defense attorney who was still in a defense mode, Judge Kinsey left the firm and definite impression that as a judge, she would remain in the "prosecution mode." We disagree and find the comments addressed the manner in which Judge Kinsey's background as a prosecutor prepared her for the position of county judge. Such comments by themselves are not per se improper; a candidate is free to discuss his or her background, qualifications for the position, and character and integrity, as well as the background and qualifications of his or her opponent.
During the same interview, however, Judge Kinsey also stated that it was a judge's responsibility to be "absolutely a reflection of what the community wants." We conclude that this statement is directly contrary to Canon 3B(2) of the Code, which states, "A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism." Faithful adherence to this canon is necessary to conform to Canon 7A(3)(a), which requires candidates for judicial office to "act in a manner consistent with the integrity and independence of the judiciary." Fla.Code Jud. Conduct, Canon 7A(3)(a).[9] A judicial officer must fulfill his or her obligation to uphold the constitutional and statutory rights of the litigants before the Court, notwithstanding that such decision may be unpopular with the community. This is fundamental to judicial independence. We therefore find that this statement was a violation of Canon 7A(3)(a).

Charge 7
In another piece of campaign literature entitled "A Shocking Story of Judicial *90 Abuse," Judge Kinsey misrepresented facts in order to demonstrate that Judge Green had a shocking lack of compassion for victims of crime. The flyer describes an incident where Grover Heller was arrested after being charged with battering his mother. Judge Green released him, and soon afterward, the defendant's parents returned to the judge asserting that the defendant was making threatening phone calls. In bold large letters, the leaflet then stated, "Instead of revoking Grover Heller's bond and putting this abusive punk in jail, Judge William Green offered to put his elderly parents in jail."
The statements contained in this brochure are clearly intended to send the message that Judge Green did not revoke Grover Heller's bond, when in fact he did. Judge Kinsey asserts that her pamphlet did not make a knowing misrepresentation because the flyer included reprinted newspaper articles which detailed the complete facts of the Heller case. Upon reviewing the pamphlet, it is clear that voters were not meant to read each of the articles: the reprinted articles had very small print and most of the articles were stacked on top of each other so portions of the articles could not be read. More importantly, a voter should not be required to read the fine print in an election campaign flyer to correct a misrepresentation contained in large, bold letters. There is clear and convincing evidence that Judge Kinsey made knowing misrepresentations as to her opponent's actions on the bench in the Heller case.

Charge 9
The JQC found Judge Kinsey guilty of making a knowing misrepresentation as to the nature and seriousness of the criminal charges which were pending in State v. Johnson, implying that the defendant had been charged with attempted murder and burglary at the time of his appearance for bond consideration when he had not. This charge relied on a pamphlet entitled "A Vital Message From Law Enforcement," in which Judge Kinsey detailed the facts of several cases where "Judge `Let `em Go' Green" released defendants into the community on bond. The first case described in the flyer involved a defendant named Stephen Johnson and stated that he was charged with: "Attempted First Degree Murder, Burglary of a Dwelling with a Battery, Violation of a Restraining Order (Domestic Violence) and False Imprisonment (Kidnaping)." The brochure described the facts of the case wherein Judge Green released Johnson on bond after he violated a restraining order by kicking down his wife's front door and attempting to strangle her "to the point that he was charged with attempted murder."
The pamphlet leaves the clear impression that Johnson had been charged with attempted murder and burglary at the time he appeared at his bond hearing. Contrary to the implication, Johnson was not charged with these crimes until after Judge Green ordered his bond set at $10,000. Judge Kinsey asserts that the flyer does not contain an intentional misrepresentation because the facts of the case would have supported a charge of attempted murder and burglary. We reject this argument as meritless. As Judge Kinsey had already described the facts of the case in detail, she had only one purpose for putting the later charges in the brochureto embellish her allegations that Judge Green made various decisions of a questionable nature while on the bench. There is sufficient evidence to support the JQC's findings that Judge Kinsey made intentional misrepresentations in this flyer.

Charge 10
Charge 10 alleged that Judge Kinsey violated Canon 1, Canon 2A, Canon *91 3B(5), Canon 3B(9), and Canon 7A(3)(d)(ii) by making public comments on pending cases which could affect their outcome or impair the fairness and integrity of those proceedings. The brochure, "A Vital Message From Law Enforcement," discussed the facts of three criminal cases, two of which were still pending, and criticized Judge Green's decision to grant bond in each case. The JQC found that Judge Kinsey violated the applicable canons because her comments could have affected the future outcome of these cases. Judge Kinsey disagreed, asserting that in the subsequent jury selection, no prospective juror knew of the campaign literature so her comments did not affect the outcome.
The JQC's findings seem to be premised on a violation of Canon 3B(9), which prohibits a judge from making any public comment on any pending case where the comments might reasonably be expected to affect its outcome. As noted above, we find Canons 1, 2, and 3 are not applicable to the circumstances and hence we review this claim in light of the remaining applicable canon: Canon 7A(3)(d)(ii), which prohibits a candidate from knowingly making comments that commit or appear to commit the candidate to cases or issues which are likely to come before the court. We find there is not clear and competent evidence to show that Judge Kinsey violated this canon. Although Judge Kinsey commented on two cases still pending, these cases were not likely to come before her if she was elected to the office of county court judgethe two pending cases involved serious felonies which would be heard in circuit court. We are concerned, however, as to whether it is appropriate for a judicial candidate to make public comments on pending cases where such comments could affect their future outcomes and accordingly refer this matter to the Judicial Ethics Advisory Committee for study.

Charge 12
The panel found that based on the violations of the canons as addressed above, Judge Kinsey engaged in conduct unbecoming a candidate for a judicial post and brought the judiciary into disrepute by conveying the false and misleading impression of the judge's role, particularly in the handling of criminal cases. We agree. Judge Kinsey's campaign materials gave the misleading impression that a judge's role in criminal proceedings is to combat crime and support police officers as opposed to being an impartial tribunal where justice is dispensed without favor or bias.

DISCIPLINE
We next turn to the appropriate sanction for Judge Kinsey's misconduct. The JQC found that Judge Kinsey was guilty of serious violations and that a public reprimand alone was insufficient; accordingly, the JQC recommended that Judge Kinsey be publicly reprimanded and fined in the amount of $50,000 plus the costs of these proceedings. The amount of the fine represented approximately 50% of her yearly salary, or in other words, a six-month suspension without pay (which was the other option that the JQC considered imposing). The JQC explained this decision as follows:
The Panel finds that Judge Kinsey is guilty of serious violations growing out of her campaign in which she was successful in obtaining the position of county court judge. The Panel has no hesitancy in recommending that she be publicly reprimanded by this Court but believes leaving her in office with no further penalty is entirely inappropriate. Under the current Constitution, Judge Kinsey is subject to removal or further penalty in the form of a fine. The Hearing Panel has thoroughly deliberated this issue and concludes that *92 the penalty imposed here must be sufficient to strongly discourage others from violating the Canons governing contested elections.
At least one member of this Panel strongly urged Judge Kinsey's removal. This Panel member concurs in and would apply the statement of this Court in Alley that: "We find it difficult to allow one guilty of such egregious conduct to retain the benefits of these violations and remain in office."
However, the conduct in Alley was, in the view of the majority of the Hearing Panel, significantly more egregious than the conduct involved in the present case. Judge Alley admitted to intentionally misrepresenting the basic qualifications of her incumbent opponent and in intentionally misrepresenting her own qualifications. She altered a published newspaper to make it appear she had been endorsed by the paper which had actually endorsed her opponent. She intentionally injected party politics into the nonpartisan race. Judge Kinsey's misconduct did not rise to this level.
Despite the less egregious nature of the violations, Judge Kinsey must be punished for her conduct and such conduct simply cannot be tolerated in future elections. While a reprimand alone is insufficient, there was no evidence that Judge Kinsey is presently unfit to hold office other than her misconduct involved in winning the election. Although such misconduct can rise to the level of present unfitness as is required for removal under Article V, § 12(a)(1), here, the Panel finds the conduct does not warrant removal. Indeed, the Investigative Panel made no direct argument to this Panel that Judge Kinsey should be removed. (T. 45, 570-575). The recommendation of a penalty was left entirely to the Hearing Panel.
Thus under all of the circumstances including the very favorable character evidence, and after due consideration, the Hearing Panel by a vote of at least 4 members recommends that Judge Kinsey be publicly reprimanded and fined the substantial sum of $50,000.00 plus costs of these proceedings. This amount should be paid within a reasonable time and jurisdiction should be retained by the JQC for purposes of enforcement.
We agree with the JQC that Judge Kinsey is guilty of serious campaign violations that warrant a severe penalty. Accordingly, this Court agrees with the JQC's recommendation as to discipline and finds that a substantial fine is warranted in order to assure the public that justice is dispensed in a fair and unbiased manner and to warn any future judicial candidates that this Court will not tolerate improper campaign statements which imply that, if elected, the judicial candidate will favor one group of citizens over another or will make rulings based upon the sway of popular sentiment in the community.

CONCLUSION
We conclude that there is clear and convincing evidence in support of the JQC's findings of fact that Judge Kinsey violated Canon 7 as alleged in charges 1, 2, 3, 4, 5, 7, 9, and 12. We also agree with the JQC's recommendation as to appropriate discipline of a public reprimand, fine, and the cost of the proceedings. Accordingly, we order that Judge Kinsey pay a fine of $50,000, plus the costs of these proceedings, and remand this case to the JQC for a determination of the amount of such costs. In accordance with the policy announced in In re Frank, 753 So.2d 1228 (Fla.2000), we also hereby command Judge Patricia Kinsey to appear before this Court for the administration of a public *93 reprimand at a time to be set by the clerk of this Court.
It is so ordered.
ANSTEAD, C.J., PARIENTE, J., and SHAW and HARDING, Senior Justices, concur.
ANSTEAD, C.J., concurs specially with an opinion.
PARIENTE, J., concurs with an opinion.
LEWIS, J., concurs in part and dissents in part with an opinion.
WELLS, J., dissents with an opinion, in which QUINCE, J., concurs.
ANSTEAD, C.J., specially concurring.
While I agree with the majority in upholding the violations of Canon 7 found by the Judicial Qualifications Commission, I find the determination of appropriate discipline to be a more difficult and close issue. Although the majority opinion does not say so explicitly, it is apparent that the majority has found the election campaign abuses demonstrated here to be similar to those found in In re McMillan, 797 So.2d 560 (Fla.2001).
In addition to the evidence cited by the majority, the testimony that appears most supportive of the majority's decision is that of United States District Court Judge Lacey Collier. Indeed, Judge Collier's testimony is compelling in its condemnation of the campaign tactics involved herein precisely because such tactics misrepresent the proper role of the judiciary and seriously undermine the public's perception and confidence in a fair, impartial, and independent justice system.
Perhaps most importantly, Judge Collier explained why the campaign's improper claim that judges should be strictly bound to follow the currently prevailing popular will was particularly damaging to the public's understanding of the proper role of our system of justice:
Q. All right. Judge, if you would refer to page 7 of Exhibit 8. And do you see the statement about halfway down made by Candidate Kinsey that, quote, "It's the same law, but judges are accountable to the community. A judge's responsibility is to make sure," ellipsis, "that it's absolutely the reflection of what the community wants"?
A. Yes, sir.
Q. Judge, do those kind of remarks, in your view, have any effect on the public's perception of the judiciary?
A. That is an absolute misstatement of the role of the judiciary. It is simply not appropriate that a judge reflect what the community wants.
And I think the best example of that is the old concept that a lynch mob is the perfect democracy for everyone except the victim. And that is probably the strongest way of suggesting that this is grossly improper, to make that statement and make that the expectation of the public.
Q. Judge, do have you any personal views on the propriety of judicial elections?
A. Yes, sir.
Q. And can you share those views with the Commission, please?
A. Well, I don't know howhow much of my feelings you want, but I think the easiest way to get into it is that it isit is often argued in political circles and discussions, academics and otherwise, that if our founding fathers came back today and drove down the street after landing in their spaceship and saw a sign that says, "Vote for John Jones as county judge," they'd get back on the plane and leave because they *94 would be convinced that they'd made a wrong turn and landed in the wrong country because it didn't resemble anything that they had envisioned when they created what they thought was an independent judiciary.
And elections, it is argued by many thinkers, is simply incompatible with an independent judiciary because it suggests this very thing, that the judicial decisions should be a reflection of the community and what the community wants.
And that's the troubling aspect of elections such as this that we've had in this county and circuit this past time, is that if that becomes the public's expectationsthat they're going to dictate to the judgesif that were to continue to its ultimate, then they would be dictating to judges because the judge would have grave concern about any case; in particular, cases of public interest.
And I would suggest that the defendant in those type of cases might be illserved by that type of attitude forced upon the judiciary by the expectation of the public as suggested here, that judges and their decisions should be an absolute reflection of what the community wants.
Q. Now, Judge, have any of your opinions and statements here today been affected by your personal views on the propriety of judicial elections?
A. No. I totally and completely support the laws in Florida; suggest that I think judicial elections, while they might not be in the absolute best interest of the public or the system, but they can be done properly.
We've had elections in and about this county and this circuit that did not seem to be conducted with the same rancor and deception, disgusting performance, that we saw in these elections.
And so my statements are not a condemnation of the system as a whole. I think it can operate if people properly have respect for the system and stay within the bounds of propriety.
While the issue of discipline is close, I am moved by the force of Judge Collier's testimony to join the majority's conclusion.
PARIENTE, J., concurring.
Although this case has produced several different opinions as to the proper discipline to impose, it is important to note that the Court unanimously condemns the conduct of Judge Kinsey during her 1998 election campaign. Because of the view of Justice Wells that this case only calls for a public reprimand, and the view of Justice Lewis that the conduct of Judge Kinsey during her election campaign is sufficiently egregious to warrant her removal, I write to explain why I agree with the majority's decision to approve the recommendation of the Judicial Qualifications Commission as to discipline.
In Florida, the Code of Judicial Conduct attempts to strike a balance between the need to inform the electorate about the qualifications of judicial candidates and the need for judges to maintain the appearance of impartiality. Indeed, since our Code was amended in 1994 to remove the "pledge and promise" clausethe very clause found to be unconstitutional in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002)hundreds of candidates campaigning for judgeships have successfully balanced the competing interests inherent in judicial elections without making statements that impugn their impartiality, cater to a particular group, or make misrepresentations as to their opponents' qualifications and track records.
In the past several years, we have had three notable cases of judicial candidates *95 who stepped over the line during elections: In re Alley, 699 So.2d 1369 (Fla.1997), In re McMillan, 797 So.2d 560 (Fla.2001), and now this case. In the case of In re Alley there appears no doubt that a sanction greater than a public reprimand would have been imposed but for the fact that at that time the constitution prevented the Court from increasing the proposed sanction recommended by the JQC.[10]See 699 So.2d at 1370. In McMillan, the respondent not only committed serious violations while campaigning but also, while sitting as a judge, committed additional violations that called into question his continued fitness to hold office. See 797 So.2d at 573.
Justice Lewis makes a strong case as to why Judge Kinsey's conduct was intolerable. He asserts that if the conduct was as egregious as the majority depicts, then removal is the only alternative. He fears that this Court will convey the message that, if willing to pay a fine, a candidate can buy an election.
Admittedly, I have wrestled with the concept of a fine, albeit a substantial one, as the appropriate sanction in this case. However, I have reached the conclusion that we should follow the recommendation of the JQC for three primary reasons.
First, the options now available to this Court to impose sanctions for judicial violations of the Code range from a public reprimand to removal from office. Constitutionally authorized sanctions such as the imposition of a fine and the suspension from office fall between those two extremes. Because the constitution has only recently been amended to allow for the imposition of other sanctions,[11] we have not developed a body of case law as to when a fine, a suspension, or a combination of authorized penalties should be imposed. However, a suspension, while symbolically a stronger sanction than a fine, has the unavoidable consequence of also creating a hardship for the judicial system and the citizens of a particular circuit by creating a vacancy in the judiciary for a period of time. Thus, although imposing a fine may not always be an entirely satisfactory method for redressing the harm that has resulted from an election violation, in my view, a fine, coupled with a public reprimand, is appropriate in certain circumstances.[12]
Second, although this Court has the ultimate responsibility under the constitution for the choice of sanction, the JQC is the body that the constitution has created to monitor the conduct of judges. While we have not hesitated to disapprove recommendations that we considered too lenient, most recently in the case of In re Rodriguez, 829 So.2d 857 (Fla.2002),[13] the recommendations *96 of the JQC as to discipline have persuasive force and should be given great weight. See In re Miller, 644 So.2d 75, 78 (Fla.1994). Indeed, while this Court bears the ultimate responsibility for discipline, in my view a certain amount of deference is appropriate considering the JQC's considerable expertise. I thus rely on both the JQC's recommendations and its stated explanation for the recommended sanction:
The Panel has no hesitancy in recommending that she be publicly reprimanded by this Court but believes leaving her in office with no further penalty is entirely inappropriate. Under the current Constitution, Judge Kinsey is subject to removal or further penalty in the form of a fine. The Hearing Panel has thoroughly deliberated this issue and concludes that the penalty imposed here must be sufficient to strongly discourage others from violating the Canons governing contested elections.
At least one member of this Panel strongly urged Judge Kinsey's removal. This Panel member concurs in and would apply the statement of this Court in Alley that: "We find it difficult to allow one guilty of such egregious conduct to retain the benefits of these violations and remain in office."
However, the conduct in Alley was, in the view of the majority of the Hearing Panel, significantly more egregious than the conduct involved in the present case. Judge Alley admitted to intentionally misrepresenting the basic qualifications of her incumbent opponent and in intentionally misrepresenting her own qualifications. She altered a published newspaper to make it appear she had been endorsed by the paper which had actually endorsed her opponent. She intentionally injected party politics into the nonpartisan race. Judge Kinsey's misconduct did not rise to this level.
Despite the less egregious nature of the violations, Judge Kinsey must be punished for her conduct and such conduct simply cannot be tolerated in future elections. While a reprimand alone is insufficient, there was no evidence that Judge Kinsey is presently unfit to hold office other than her misconduct involved in winning the election. Although such misconduct can rise to the level of present unfitness as is required for removal under Article V, § 12(a)(1), here, the Panel finds the conduct does not warrant removal. Indeed, the Investigative Panel made no direct argument to this Panel that Judge Kinsey should be removed. The recommendation of a penalty was left entirely to the Hearing Panel.
Thus under all of the circumstances including the very favorable character evidence, and after due consideration, the Hearing Panel by a vote of at least 4 members recommends that Judge Kinsey be publicly reprimanded and fined the substantial sum of $50,000.00 plus costs of these proceedings.
Finally, and perhaps most importantly to me, Judge Kinsey has now served more than four years since her 1998 election and there has been no suggestion that she has acted other than impartially to all litigants since her election as a judge. In my view, the fact that there has been no suggestion that she has conducted herself in a manner other than in accord with the Code of Judicial Conduct substantially differentiates this case from other cases in which we have removed judges from office.
For example, in McMillan, while election conduct charges were pending in this Court, additional charges were filed *97 against Judge McMillan involving actual cases in which Judge McMillan served as a judge. See McMillan, 797 So.2d at 564.[14] Because Judge Kinsey has, for four years now, apparently conducted herself in a manner befitting an impartial arbiter of the law, I am compelled to concur with the JQC's finding that there is "no evidence that Judge Kinsey is presently unfit to hold office," and to support the JQC's recommendation as to the appropriate discipline.
Based on these considerations I conclude that the substantial fine and public reprimand do not soil the judiciary, but rather serve as a forceful warning that the tactics in which Judge Kinsey deliberately engaged during the election will not be tolerated by this Court. I do hope that Judge Kinsey, the public, and future judicial candidates receive the correct messagenot that justice is for sale or that the ends justify the means, but that to engage in this type of campaign tactic imperils the very foundation of our justice system.
LEWIS, J., concurring in part and dissenting in part.
While I concur in the decision of the majority approving the Commission's finding a violation of Canon 7 of the Code of Judicial Conduct by Judge Kinsey, I cannot agree with a number of points within the majority opinion. My consideration of the Code leads me to conclude that the conduct presented here is in violation of the principles outlined in Canons 1, 2, 3, and 7, and this, along with a $50,000 fine, soils the judicial position to the extent that removal is the only reasonable alternative. In my view, one of the most important factors is that the conduct this Court considers today was not simply the product of an isolated instance of indiscretion, a momentary lapse of judgment, or the exposure of human frailty from which we all suffer from time to time. The conduct here was repeated, intentional, direct action with a designed purpose which cast aspersions and doubt onto the heart of the judicial system and the elected judicial office sought by Judge Kinsey. The proper discipline for this type of conscious, purposeful behavior directed to the judicial office is removal, and I dissent.
I fear that the majority opinion reflects an attempt to "split the baby" in determining that the conduct analyzed is not protected speech, yet the appropriate discipline is to be a reprimand and an enormous fine. In my view, the conduct here is either protected speech deserving no discipline, or egregious non-protected conduct and promises of future conduct deserving of removal from the bench. I thus regard the opinion voiced by Justice Wells in his dissent as certainly an arguable perspective, but I must respectfully disagree.

Conduct
First, I cannot agree with the majority's conclusion that Canons 1, 2, and 3 are totally inapplicable during the candidacy of judges. The preamble to the Code of Judicial Conduct reads: "The Code is designed to provide guidance to judges and candidates for judicial office and to provide a structure for regulating conduct through disciplinary agencies." Fla.Code Jud. Conduct, Preamble (emphasis supplied). Further, as expressly noted by the majority, see majority op. at 85 n. 4., but inexplicably ignored, "This Court has consistently ruled that pre-judicial conduct *98 may be used as a basis for removal or reprimand of a judge." In re Davey, 645 So.2d 398, 403 (Fla.1994). Although Judge Davey had been elected at the time the misconduct occurred, he was not a sitting Article V judge. Canon 1 and Canon 2 were determined to be applicable under such circumstances, and the same reasoning should apply here. Indeed, the Judicial Qualifications Commission "has constitutional authority to investigate pre-judicial acts and recommend to this Court the removal (for unfitness) or reprimand (for misconduct) of a sitting judge." Id.
The Code of Judicial Conduct expressly provides that "[t]he Canons and Sections are rules of reason." Fla.Code Jud. Conduct, Preamble. Therefore, the interests underlying the Canons themselves must be considered in connection with the issue of whether they apply to candidates for judicial office as well as sitting judges. "[J]udges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system." Id. This principle is no less applicable to judicial candidates than current judges; indeed, because judicial elections may represent one of the few times in which the general public directly scrutinizes the behavior of judges and judicial candidates, the entirety of the standards enunciated in the Code must be followed by both groups. We cannot have, and it is totally unworkable and illogical to have, different and multiple standards applicable to candidates for the same judicial position.
Additionally, I read the text of Canon 7(A)(3)(a) as requiring judicial candidates to conduct themselves in accordance with the entirety of the Code. Specifically, Canon 7 states: "A candidate for judicial office... shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary...." Fla.Code Jud. Conduct, Canon 7(A)(3)(a). Clearly, this provision mandates that a candidate for the bench must comply with the same standards as sitting judges. The principles embodied in Canons 1, 2, and 3 are incorporated into Canon 7, and cannot be simply ignored. Therefore, I dissent from that portion of the majority opinion which does precisely that.
I must also dissent from that part of the majority's conclusion which addresses Charge 4. Having repeatedly reviewed the comments expressed during this radio interview, I must conclude that Judge Kinsey's discussion with the caller had absolutely nothing whatsoever to do with her background or qualifications or those of her opponent, Judge Green. Further, her comments did not relate to character or integrity in any fashion. Her publicly broadcasted commentary was nothing less than an attack upon any and all attorneys who had at any time in their pasts represented a criminal defendant, and was specifically aimed at Judge Green. She portrayed herself as a prosecutor who would continue to prosecuteeven though she was seeking election to an office which demands nothing less than complete neutrality. See In re McMillan, 797 So.2d 560, 571 (Fla.2001) ("This Court has declared from time immemorial that the lack of bias and partiality is an essential prerequisite to service as a judicial officer."). The campaign tactic here, as demonstrated by Judge Kinsey's comments during this radio interview, was nothing other than a "law and order" campaign designed to inflame public opinion and pander to principles totally contrary to a fair and impartial application of the law by a neutral arbiter in the judicial system. In my view, Judge Kinsey's statements during this radio interview violated Canons 1, 2, 3, and 7 of the Code of Judicial Conduct, and constituted *99 a specific pledge and promise of inappropriate conduct in judicial office.

Discipline
As noted above, I concur in the portion of the majority decision concluding that Judge Kinsey's statements and conduct constitute pledges and promises of conduct in judicial office not qualified as protected speech under the decision of the United States Supreme Court in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). However, because "[t]he Code of Judicial Conduct is clear and unambiguous as to its proscription against both judges and judicial candidates making `pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office,'" McMillan, 797 So.2d at 566, the only rational conclusion would be the removal of Judge Kinsey from the position secured through inappropriate pledges and promises, among the other violations.
In my view, the imposition of this fine, the amount of which is clearly designed and intended to represent the enormity of the reprehensible behavior, sends the message to future candidates that they may violate the Code and commit ethical breaches, if they are prepared to pay a monetary fine following the election. The kinds of promises and type of condemnable campaign behavior demonstrated here tarnishes the very purpose for which the judiciary was establishedto fairly and impartially consider any and all matters, without preconceived notions or positions about the merits of each case. Judges should not pledge to be prosecutors or defense attorneys; they should pledge to administer the law neutrally and justly. In the final analysis, the essential question here is whether the parent of a child who has been wrongly accused of a crime could walk into a courtroom and look to Judge Kinsey with confidence that his or her child would be fairly treated and given justice in her courtroom. After hearing Judge Kinsey's radio interview, and reading the campaign literature at issue, the clear answer is no. I conclude that if the actions are so reprehensible that the majority believes the imposition of a $50,000 fine is justified, those actions must certainly justify removal from the office so tainted. Selecting an enormous fine as discipline only sends the message that "anything goes" in judicial elections if a candidate has the financial ability to pay the monetary consequences. Indeed, in this era in which many judicial candidates in Florida are able to produce significant campaign funds from donations or personal assets, there may come a day when candidates simply maintain monetary reserves to pay fines following the election and then only the economically powerful can successfully compete in the election process.
I fear that the majority attempts to walk a fine, if not illusory, line by determining that the United States Supreme Court's decision in White does not protect Judge Kinsey's statements, yet approving an enormous monetary fine and reprimand as discipline. The issue is quite clear to me: either this Court should dismiss the charges of misconduct on the authority of White, or the judicial office is so tainted that a removal from office is the only rational result. I believe the campaign actions of Judge Kinsey are quite similar to the behavior relating to the credibility of law enforcement witnesses described and condemned by the Second District Court of Appeal as "a flagrant violation of... the Code of Judicial Conduct" in Dougherty v. State, 746 So.2d 486, 488 (Fla. 2d DCA 1999). "[T]o allow someone who has committed such misconduct during a campaign to attain office to then serve the term of judgeship obtained by *100 such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins." McMillan, 797 So.2d at 573.
Based upon the foregoing, I respectfully dissent from the majority's conclusions regarding the discipline in this case. I would conclude that clear and convincing evidence exists in support of the JQC's determinations that Judge Kinsey violated Canons 1, 2, 3, and 7. Further, if the payment of a $50,000 fine is appropriate and necessary, it so taints the judicial office that removal is the only alternative.
WELLS, J., dissenting.
I dissent from the majority's decision. I would approve only the recommendation that Judge Kinsey was guilty of material misrepresentations in charges 7 and 9. For that, I believe the appropriate sanction would be a public reprimand.
My reason for dissenting as to the acceptance of the other charges is that I believe that the JQC's findings of guilt in respect to those charges are in direct conflict with the decision of the United States Supreme Court in Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). While I agree with this Court's majority that the Court in White did not declare our Code's "pledge or promise" clause unconstitutional, I cannot read the charges for which the JQC found Judge Kinsey guilty in charges 1, 2, 3, 4, 5, and 12 as being other than charges based upon Judge Kinsey announcing her position on these matters. The guilty findings run directly contrary to the United States Supreme Court decision by which we are bound.
QUINCE, J., concurs.
NOTES
[1] In re Davey, 645 So.2d 398, 404 (Fla.1994) ("The findings and recommendations of the Judicial Qualifications Commission are of persuasive force and should be given great weight.").
[2] Rule 4-8.2(b) of the Rules Regulating The Florida Bar requires, "A lawyer who is a candidate for judicial office shall comply with the applicable provisions of Florida's Code of Judicial Conduct." (Emphasis added.)
[3] The term "judge" is defined by the Code as "Article V, Florida Constitution judges and, where applicable, those persons performing judicial functions under the direction or supervision of an Article V judge." Fla.Code Jud. Conduct, Definitions.
[4] See also In re Davey, 645 So.2d 398, 403 (Fla.1994) ("This Court has consistently ruled that pre-judicial conduct may be used as a basis for removal or reprimand of a judge.").
[5] This canon was based on Canon 7(B) of the 1972 American Bar Association (ABA) Model Code of Judicial Conduct. In 1990, the ABA modified this canon based on concerns that the 1972 version was worded so broadly that it would violate the constitution. Florida, unlike Minnesota, changed its judicial canons to conform with the 1990 version.
[6] Some of the statements Judge Kinsey made during her campaign run completely contrary to this commentary. For example, in one radio address, Judge Kinsey declared that it was her responsibility as a judge to be "absolutely a reflection of what the community wants." As is clear from this country's history, there have been numerous times where the popular will of the community ran contrary to the law. In such cases, it is the judge as the impartial decision-maker who will ensure that the law is complied with.
[7] See In re Code of Jud. Conduct, 603 So.2d 494, 497 (Fla.1992) ("Maintaining the impartiality, the independence from political influence, and the public image of the judiciary as impartial and independent is a compelling governmental interest."); see also Landmark Communications, Inc., v. Virginia, 435 U.S. 829, 848, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (Stewart, J., concurring in the judgment) ("There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary."); Cox v. Louisiana, 379 U.S. 559, 565, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) ("A State may also properly protect the judicial process from being misjudged in the minds of the public."); Morial v. Judiciary Comm'n, 565 F.2d 295, 302 (5th Cir.1977) ("The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.").
[8] Charge 5, for example, also contains other alleged examples of misconduct, such as highlighting that she had the "unanimous support of law enforcement" and was endorsed by both Florida Police Benevolent Association and the Fraternal Order of Police. This type of endorsement may certainly be brought to the attention of the voters and is not prohibited by the judicial canons. However, based on other statements contained in brochures as addressed above, Judge Kinsey went beyond the permissible boundaries.
[9] In determining whether a judicial candidate has violated his or her oath to "act in a manner consistent with the integrity and independence of the judiciary," this Court may look to Canons 1, 2, and 3 for guidance.
[10] See art. V, § 12(f), Fla. Const. (1995). Prior to the adoption of the 1996 amendment, the only sanctions available to the Supreme Court against a sitting judge were public reprimand and removal. Also, prior to the 1996 amendment, the Supreme Court could accept, reject, or impose a lesser sanction against a judge. However, the Court was not authorized to increase the proposed sanction of a public reprimand. See In re Alley, 699 So.2d at 1370 n. 1.
[11] See art. V, § 12(a), Fla. Const. (amended in 1996 to define "discipline" as including "reprimand, fine, suspension with or without pay, and lawyer discipline").
[12] Cf. Pasquale v. Fla. Elections Comm'n, 759 So.2d 23 (Fla. 4th DCA 2000) (affirming fine for failing to report value of a campaign contribution); Ferre v. State ex rel. Reno, 478 So.2d 1077 (Fla. 3d DCA 1985) (affirming $35,000 fine on mayor who accepted improper post-election campaign contributions), approved, 494 So.2d 214 (Fla.1986); see also § 106.265, Fla. Stat (2002) (authorizing imposition of fine of up to $1000 for each count of campaign financing violation).
[13] In that case, we rejected the initial JQC recommendation, and subsequently approved a more significant sanction, which included a suspension, a fine, and a public reprimand. See Rodriguez, 829 So.2d at 858-61.
[14] See also In re Graziano, 696 So.2d 744 (Fla.1997) (affirming JQC's recommendation that Judge Graziano be removed from office for actions that constituted "rank misuse of respondent's judicial office").