PER CURIAM.
We have for review the recommendation of the Judicial Qualifications Commission (JQC) that Circuit Judge John Renke III be disciplined for numerous violations of the Code of Judicial Conduct. We have jurisdiction. See art. V, § 12, Fla. Const. As we explain below, given the flagrant misrepresentations made to the voting public during Judge Renke’s judicial campaign, coupled with the serious campaign financial misconduct and violations of law found by the JQC, we conclude that he is presently unfit to hold office and that removal from the bench is the only appropriate sanction in this case.

*485
CHARGES

This case arose out of a series of charges filed against Judge John Renke by the JQC alleging that during his 2002 election campaign for the office of Circuit Court Judge for the Sixth Judicial Circuit, he committed certain acts in violation of Canon 7 of the Code of Judicial Conduct. The original Notice of Formal Charges was filed in October of 2003, and in April of 2004, the JQC entered its findings and recommendations of discipline. The JQC and Judge Renke presented a stipulation to this Court pursuant to article V, section 12 of the Florida Constitution and rule 6(j) of the Florida Judicial Qualifications Commission Rules, in which Judge Renke admitted to the conduct alleged and did not contest either the findings of guilt or the recommendation of discipline. At that time, he also waived a plenary hearing before the Hearing Panel of the JQC and oral argument before this Court.
In July of 2004, we determined that the JQC’s recommended disposition should be rejected as too lenient and directed the JQC to conduct further proceedings on the merits of the case. The JQC then amended the charges, adding an additional count concerning an alleged improper $95,800 contribution to the Renke campaign from Judge Renke’s father in violation of sections 106.08(l)(a), 106.08(5) and 106.19(a) and (b), Florida Statutes (2002). This campaign financial charge became count 8 of the Second Amended Notice of Formal Charges of August 24, 2005. Before trial, the JQC’s charging document asserted:
1.During the campaign, in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii) you knowingly and purposefully misrepresented in a campaign brochure ... that you were an incumbent judge by describing yourself as John Renke, a Judge With Our Values when in fact you were not at that time a sitting or incumbent judge.
2. During the campaign, in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii), you knowingly and purposefully misrepresented in the same brochure ... your holding of an office in the Southwest Florida Water Management District by running a picture of you with a nameplate that says “John K. Renke, III Chair” beneath a Southwest Florida Water Management District banner, when you were not in fact the Chairman of the Southwest Florida Water Management District.
3. During the campaign, in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii), you knowingly and purposefully misrepresented in the same brochure ... your endorsement by the Clearwater firefighters by asserting that you were “supported by our areas bravest: John with Kevin Bowler and the Clearwater firefighters” when you did not then have an endorsement from any group of or any group representing the Clearwater firefighters.
4. During the campaign, in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii), you knowingly and purposefully misrepresented in the same brochure ... your judicial experience when you described yourself as having “real judicial experience as a hearing officer in hearing appeals from administrative law judges,” when your actual participation was limited to one instance where you acted as a hearing officer and to other instances where you were sitting as a board member of an administrative agency.
5. During the campaign, in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii), you knowingly and purposefully misrepresented your endorsement by Pinellas County public officials in a *486 campaign flyer ... when you listed a number of persons, including Paul Be-dinghaus, Gail Hebert, John Milford, George Jirotka and Nancy Riley as such, when they in fact were not Pinellas County public officials but instead officials of a private, partisan political organization to wit, the Pinellas County Republican Party.
6. During the campaign in violation of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii), you knowingly and purposefully misrepresented your experience as a practicing lawyer and thus your qualifications to be a circuit court judge. In the Candidate Reply you authored which was published by and in the St. Peters-burg Times, you represented that you had “almost eight years of experience handling complex civil trials in many areas.” This was knowingly false and misleading because in fact you had little or no actual trial or courtroom experience.
7. During the campaign in violation of Canon 7 A(3)(a) and Canon 7(A)(3)(d)(iii), you knowingly and purposefully misrepresented your experience as a practicing lawyer and thus your qualifications to be a circuit court judge, as well as your opponents experience, by asserting in a piece of campaign literature that your opponent lacked “the kind of broad experience that best prepares someone to serve as a Circuit Court Judge” and represented to the voting public that the voters would be “better served by an attorney [like you] who has many years of broad civil trial experience.” This was knowingly false because your opponent had far more experience as a lawyer and in the courtroom and in fact you had little or no actual trial or courtroom experience.
8. During the campaign, in violation of Canon 2, Canon 2 A and Canon 7 A(3)(a) and §§ 106.08(l)(a), 106.08(5) and 106.19(a) and (b), Florida Statutes, your campaign knowingly and purposefully accepted a series of “loans” totaling $95,800 purportedly made by you to the campaign which were reported as such, but in fact these monies, in whole or in substantial part, were not your own legitimately earned funds but were in truth contributions to your campaign from John Renke II (or his law firm) far in excess of the $500 per person limitation on such contributions imposed by controlling law.
9.During the campaign, in violation of Canon 7 A(3)(a) and Can on 7 A(3)(d)(iii), you made a deliberate effort to misrepresent your qualifications for office and those of your opponent as detailed in Charges 1 through 7, supra, which cumulative misconduct constitutes a pattern and practice unbecoming a candidate for and lacking the dignity appropriate to judicial office, which had the effect of bringing the judiciary into disrepute.
Subsequently, after a final hearing before an adjudicatory panel, the JQC found Judge Renke guilty on counts 1, 2, 3, 6, 7, 8 and 9; however, the JQC did not find Judge Renke guilty of counts 4 or 5. Based on these findings, the JQC recommended a $40,000 fine, a public reprimand by this Court, and that Judge Renke be responsible for the costs of these proceedings.

FINDINGS OF FACT

In judicial disciplinary proceedings, this Court reviews the findings of the JQC to determine if they are supported by clear and convincing evidence and reviews the recommendation of discipline to determine whether it should be approved or whether other discipline is appropriate. In re Andrews, 875 So.2d 441, 442 (Fla.2004). As we have noted before, the clear and convincing evidence standard
*487 requires more proof than a “preponderance of the evidence” but less than “beyond and to the exclusion of a reasonable doubt.” If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. This is so because the JQC is in a position to evaluate the testimony and evidence firsthand. However, the ultimate power and responsibility in making a determination rests with this Court.
In re Graziano, 696 So.2d 744, 753 (Fla. 1997) (citations omitted) (quoting In re Davey, 645 So.2d 398, 404 (Fla.1994)). After extensive review of the record and the evidence submitted by both sides, we find an abundance of competent evidence to support the JQC’s conclusions that the charges found proven were established by clear and convincing evidence.
Counts 1, 2 and 3
The basis of these charges is founded upon various statements made in one of Judge Renke’s campaign brochures, and all involve violations of Canon 7 A(3)(a) and Canon 7 A(3)(d)(iii). The Code of Judicial Conduct was recently amended by this Court, effective January 2006; while the text of the particular Canon subsection has not changed, Canon 7(A)(3)(d)(iii) is now Canon 7(A)(3)(d)(ii). It reads, as it did at the time that Judge Renke was charged, that a candidate for judicial office shall not “knowingly misrepresent the identity, qualifications, present position or other fact concerning the candidate or an opponent.”[1]
The record reflects that Judge Renke arranged for the Mallard Group, a political campaign company headed by John Herbert, to do all of the direct mail campaign work; however, the judge reviewed and approved all of the campaign materials designed by Herbert. Regarding the first charge, the JQC concluded that the phrase “a judge with our values,” written in large yellow print, surrounding a photo of the Renke family, and coupled with other text from the brochure stating that Renke had “real judicial experience as a hearing officer and in hearing appeals from administrative law judges,” knowingly and purposefully created the impression that Judge Renke was running as an incumbent judge when he was not.
Count 2 concerned a picture, prominently displayed in the same brochure, of Judge Renke sitting just beneath a large banner stating “Southwest Florida Water Management District” in front of a nameplate reading, “John K. Renke Chair.” The JQC concluded that this was a deliberate attempt to convey to the public that he was the chairman of the Southwest Florida Water Management District (SWFWMD), a public body of considerable importance and responsibility in the area, when actually he was only chair of the Coastal River Basin Board. In fact, the parties agree no such position as chairman of the SWFWMD even exists.
Finally, with regards to the third charge, the JQC concluded that a picture of Judge Renke, surrounded by firefighters with the caption “Supported by our area’s bravest: John with Kevin Bowler *488 and the Clearwater firefighters,” was an attempt to wrongfully convince the public that he had the official support of the Clearwater firefighters. The panel found that the use of the photograph with the accompanying caption was an intentional misrepresentation of Judge Renke’s campaign endorsements.
We conclude that the JQC’s findings that these three charges have been established by clear and convincing evidence are supported by the evidence received at the hearing. In In re Kinsey, 842 So.2d 77 (Fla.2003), this Court concluded that “a voter should not be required to read the fine print in an election campaign flyer to correct a misrepresentation contained in large, bold letters.” Id. at 90. This admonition has special meaning to the misconduct established here.
As to the first charge, Judge Renke himself testified that the statement, “a judge with our values,” could be misleading to the voting public. As to count 2, Judge Renke admitted that the photograph was also inaccurate. While he points to other text in the same pamphlet indicating that Judge Renke was only “awarded an appointment by the Governor to the Governing Board of the Southwest Florida Water Management District,” In re Kinsey provides that smaller or other text elsewhere in a brochure does not serve to rectify bold misstatements made in the same document. 842 So.2d at 90. In reference to the third charge, again, Judge Renke testified at his hearing that he did not have the support of the Clear-water firefighters union or any actual Clearwater firefighters group or organization. While Judge Renke stated that he did have the support of the particular firefighters posing with him in the campaign brochure photograph, he conceded that he was aware that the firefighters were represented by a union and that he had never asked for their endorsement.
The record provides abundant evidentia-ry support for the JQC’s findings and its conclusion that there was a clear pattern of intentional misrepresentation with regard to the three charges concerning this particular brochure, specifically that Judge Renke was attempting to convey to the voters that he was running as an incumbent judge, was the chair of the SWFWMD, and finally that he was endorsed by the local firefighters. These findings establish clear violations of the judicial canon’s prohibition on knowing misrepresentations of a candidate’s experience and qualifications for judicial office. Accordingly, we uphold the JQC’s findings of guilt on counts 1, 2 and 3.
Counts 6 and 7
Counts 6 and 7 are similar to counts 1-3 but are even more serious, as they involve substantial misrepresentations as to the relevant qualifications for judicial office. These two charges are related to statements Judge Renke made prior to the election, by which the JQC concludes he vastly overstated his relevant legal experience and qualifications for the bench. Count 6 concerned a “Candidate Reply” authored by Judge Renke and submitted to the St. Petersburg Times, in which he claimed he had “almost eight years of experience handling complex civil trials in many areas.” The JQC, rejecting Judge Renke’s explanation that he did not grasp the difference between handling a complex “trial” versus mere “litigation experience,” concluded that this was a false statement. Count 7 concerned a piece of campaign literature in which Judge Renke stated that his opponent in the judicial election did not have the kind of broad experience necessary to be a circuit judge and that the public would instead be “better served by an attorney [like you] who has many *489 years of broad civil trial experience.” The JQC, concluding that this was a clear misrepresentation regarding his qualifications, disregarded Renke’s claim that the statement regarding his years of “broad civil trial experience” was accurate, since his opponent’s experience was primarily in the area of criminal law.
As with the first set of charges, we also find that the findings of misconduct on counts 6 and 7 are supported by clear and convincing evidence. Among other testimony given at the hearing below, Judge Renke testified that he had never acted as lead counsel in a jury trial and that the only trial he tried on his own was a small claims case. He also testified that the claim regarding his eight years of “broad civil trial experience” “may not be the best and most accurate way to depict what [he] had done over eight years.” He went on to confirm that he had no criminal law experience, had never examined a witness outside of the above-mentioned small claims court case, and that he was never “on his feet” in a courtroom in a ease in which his father was lead counsel.
Furthermore, while Judge Renke disputed that he was “called out” by the newspaper’s editorial board regarding his claim that he had eight years of trial experience in the courtroom prior to his publishing the “Candidate’s Reply” at issue in count 6, the testimony makes clear that he was asked by the editorial board how many times he had, in fact, served as first chair. Although he replied that he had never served as first chair, he nevertheless still included the claim regarding his broad trial experience in his “Candidate’s Reply.”
As the JQC found, in reality Judge Renke had virtually no trial experience at all, and his explicit campaign statements to the contrary constitute blatant misrepresentations as to his qualifications. We find abundant evidence to support the JQC’s conclusion that throughout his campaign he knowingly misrepresented his experience and qualifications for judicial office in direct violation of the judicial canons of ethics.
Count 9
Because we find support for the JQC’s findings of guilt on counts 1, 2, 3, 6, and 7 as outlined above, we also conclude that its finding of guilt on count 9 is supported by clear and convincing evidence. This charge concerns a deliberate and calculated effort on the part of Judge Renke to misrepresent his experience and qualifications for judicial office. We agree, based on the charges specified in counts 1, 2, 3, 6, and 7, that Judge Renke engaged in cumulative misconduct constituting a pattern unbecoming a candidate and lacking in the dignity appropriate to judicial office which has brought the judiciary into disrepute.
Count 8
This charge, added after our rejection of the previously recommended discipline based on the charges set out above, involves a series of campaign “loans” from Judge Renke’s father to his campaign in 2002. The JQC found that the father provided substantial campaign funds to Judge Renke in 2002 and that Renke disguised these funds as earned income from which he made loans to his campaign fund. Judge Renke contended that it was mere coincidence that his income dramatically rose in 2002.
The record reflects that until his election to the bench, Judge Renke was employed in his father’s law firm, where he had worked since his graduation from law school. The firm consisted of John Renke, II, Judge Renke, and a third attorney, Thomas Gurran. John Renke, II’s wife Margaret worked at the firm for over *490 twenty years as a secretary, receiving no salary; Judge Renke’s wife also occasionally performed clerical duties at the firm.
Judge Renke was paid on an hourly basis, earning between $9.00 and $11.00 an hour with no benefits. Judge Renke’s tax records show the following net income after taxes for the eight years he worked for his father’s firm:
1995: $ 10,941
1996: $ 16,020
1997: $ 18,600
1998: $ 15,325
1999: $ 11,480
2000: $ 12,682
2001: $ 35,987
2002: $140,116
There was nothing in writing between father and son regarding Judge Renke’s compensation, and the evidence shows that there were many disputes between Judge Renke and his father regarding his pay. While John Renke continually claimed that he would retire soon and leave the firm to his son, Judge Renke testified that he ultimately decided to run for the judgeship due to his financial concerns. As the JQC concluded, the evidence overwhelmingly indicated that Judge Renke was underpaid throughout these years and he and his family functioned very close to a financial survival line.[2]
The evidence indicates that there was a verbal agreement between Judge Renke and his father that he would be paid twenty percent of the recovery in the firm’s larger cases, but there was disputed evidence as to whether this percentage fee was always paid. This fee arrangement is at the heart of count 8, specifically regarding a series of cases known collectively as the “Driftwood litigation” and involving various claims connected with a homeowner’s association. The firm had handled the cases since 1995, resulting in significant settlements and attorney’s fees. The primary dispute on review between Judge Renke and the JQC involves when the Renkes actually earned the fees generated by these cases. Judge Renke argues that the 2002 payments from his father were his share of the Driftwood settlement, to which he was rightfully entitled. He asserts that it was mere coincidence that he received these substantial increases in income at a time when he was in need of campaign funds.
The JQC rejected this explanation and concluded that while the Driftwood cases had been preliminarily settled in 2001, and a fee of $123,553 had been paid to the senior Renke, this fee was to be held in escrow pending the court’s approval of the final settlement. The insurance company for the defendant in the Driftwood cases made the payment to stop the accrual of further fees and interest, making the check payable to “John K. Renke, II Trust Account.” The agreement provided that if the court did not approve the settlement, John Renke was to return the funds. The JQC noted that a real question existed as to whether the final settlement would be approved or not, with the Renkes arguing that they technically “earned” the money when the check arrived from the insurance company in 2001. However, the JQC found that the Driftwood Homeowner’s Association and Board of Directors still had to approve various changes in the settlement agreement. Furthermore, there was a thirty-day “safeguard period” included after final court approval of the settlement before the funds could become available to ensure that an appeal had not been taken. Court approval of the settle *491 ment and a vested right to the fee did not occur until 2003.
Regarding his campaign financing, the JQC found that Judge Renke spent a total of $105,800 on his campaign. The official election filings showed he received approximately $10,000 in public contributions and that he loaned his own campaign $95,800. These monies came in the form of three different loans in the amounts of $6,000, $40,000 and $49,800, which matched incremental compensation installments paid to Judge Renke by his firm. In 2002, the year of the campaign, his final reported salary totaled $140,116, a sum far in excess of any sums previously received. Out of his total net income of $140,116, the sum of $101,800 was attributed directly to the Driftwood fees. Thus the cost of the campaign was $105,800, and the Driftwood fees were supposedly the basis for $101,800 of Judge Renke’s compensation that year, out of which he loaned his campaign $95,800.
The JQC concluded that the firm was not yet entitled to the Driftwood fees since final court approval of the settlement did not happen until August of 2003, and, even though the firm was already holding $123,553 of this money, it was being held in a form of trust and had not yet been earned because the final settlement in the case had not been approved. It should also be noted that Thomas Gurran, the second attorney working for the senior Renke, was likewise entitled to a share of the Driftwood fees; however, he was not paid until October of 2003, after the final court approval of the settlement in August 2003. Thus, the JQC concluded Judge Renke had not actually earned these fees at the time of the payment to him by his father. While it appears that a dispute existed as to the exact fee arrangement between Judge Renke and his father, the JQC concluded that such a dispute was irrelevant, since the compensation he was paid in 2002 was allegedly based solely on the pending Driftwood litigation fees. The JQC, therefore, found Judge Renke guilty of count 8, since he knowingly accepted the unearned fee amounts from his father and then directly loaned them to his own campaign. The JQC concluded that the 2002 payments were actually campaign contributions from his father.
Once again, we find adequate evi-dentiary support for the JQC’s conclusion that these fees were not actually earned until the firm had the completely vested right to them upon final court approval and the expiration of the time for an appeal. We agree that there is clear and convincing evidence to support the JQC’s conclusion that the payments to Judge Renke were intended to be campaign contributions rather than earned income. Judge Renke does not contest any of the actual evidence used by the JQC in reaching its conclusions, nor does he argue that any of the evidence is “indecisive, confused and contradictory,” as was the case when this Court overturned some of the JQC’s findings in In re Davey, 645 So.2d 398, 405 (Fla.1994). Instead, he relies on bits and pieces of the total evidentiary picture in an attempt to paint the circumstances in a manner to fit his explanations. A thorough review of the trial record, some of which we have outlined above, reveals that the JQC’s finding of guilt on this charge is warranted.
Of particular note is the testimony of Steven Mezer, an attorney who represented the Timber Oaks Community Services Association (TOSCA) as part of the Driftwood litigation. He testified that the insurance check was to be held in trust until the court approved the final settlement and that it was his understanding that John Renke was not entitled to the money before such court approval. Mezer also testified that there were many contingen- *492 eies that could affect the final approval of the settlement, since they were dealing with a large community membership that needed to be educated regarding all amendments, and also because there was infighting among the board members regarding the final deal. He stated that, as of 2002, there were indications that some board members were very much opposed to the settlement agreement and that there were also some changes in the constituency of the board. Furthermore, Mezer testified that none of these issues were a secret and he had ongoing discussions with John Renke regarding these problems throughout 2002.
The testimony of Margaret Renke further demonstrates the discrepancies surrounding both the purpose and the timing of the payments made to Judge Renke in 2002. On the one hand, she testified that Judge Renke was paid his portion of the Driftwood fees in a piecemeal fashion because John Renke was concerned that the settlement might not go through; however, she also testified that the fee was split up to cover campaign expenses as they arose, “when [Judge Renke] needed it.” Then again, however, she also stated that Judge Renke could have wanted the sum split up for tax purposes. Her testimony was also inconsistent with regard to the purpose of the payment and whether it was to remedy years of general underpayment or was due Judge Renke as payment for his specific work on the Driftwood cases.
John Renke’s testimony also reveals inconsistencies in Judge Renke’s version of events and furthermore raises questions as to the credibility of his testimony. For example, concerning the fee-sharing arrangement between the two, John Renke testified that the original plan was for Judge Renke to get twenty percent of settlements over $10,000 and that this was not up to his own personal discretion. He then testified that, in 2000, he changed his mind and told his son that he would give him half of the fees from the Driftwood settlement. However, one of the JQC prosecutors noted that in John Renke’s prior three depositions, he had never once mentioned this supposed adjustment in the Driftwood fee-sharing arrangement. An additional discrepancy arose regarding the reason he paid his son the money when he did; during one of his previous depositions, he stated that the money was for Judge Renke’s work solely on Driftwood, but at the hearing, John Renke testified to a whole list of other cases that Judge Renke worked on as reasons to compensate him in 2002. The senior Renke also testified he understood the insurance check to be his money at the time it was delivered to him, and that he was entitled to put it in any account of his choosing, spend it or do with it what he wanted.[3] However, he eventually conceded that the attorney’s fees in Driftwood were contingent on court approval of the settlement and that while he received the Driftwood check in 2001, he did not begin to disburse any payments to Judge Renke until 2002, after his son had decided to run for the judgeship. According to John Renke, the reason that he paid Judge Renke the compensation in piecemeal fashion was to minimize his own risk in case the settlement did not go through. Contradictions in *493 John Renke’s testimony, as well as the discrepancies between his statements at his deposition and then later at trial, bear on his credibility as a witness and the veracity of his explanation for the payments to his son.
Based upon our review of the record, we find ample support for the JQC’s conclusion that both the timing of the payments from John Renke to his son and their prompt deposit into Judge Renke’s campaign account indicate that these funds were not the product of mere coincidence in the payment of earned legal fees, but rather were meant to be campaign contributions. Given the many discrepancies in the testimony of both John and Margaret Renke concerning the purpose and timing of the payments to their son, as well as uncontroverted testimony by an opposing attorney in the Driftwood litigation that the settlement agreement was not final when the payments were made to Judge Renke in 2002 and other evidence in the record, we find that the JQC’s conclusion on this charge is supported by clear and convincing evidence.

DISCIPLINE

According to article V, section 12(c)(1) of the Florida Constitution, this Court has discretion to either accept, reject, or modify the commission’s findings and recommendation of discipline. In re Alley, 699 So.2d 1369 (Fla.1997) (noting that in 1996, article V, section 12 of the Florida Constitution was amended to allow the Supreme Court to modify the recommendations of the JQC). Although this Court gives the findings and recommendations of the JQC great weight, the ultimate power and responsibility in making a determination to discipline a judge rests with this Court. In re Angel, 867 So.2d 379, 382 (Fla.2004).
As mentioned above, this case originally came before us in July of 2004, when the JQC charged Judge Renke only with the campaign literature violations that form the bases of counts 1 through 7 and count 9 of the current proceedings. However, we remanded the case back to the JQC to conduct additional proceedings, having determined that the recommended penalty of a $20,000 fine, a thirty-day suspension, and a public reprimand was not severe enough for the violations presented at that time.
After our rejection and remand, the JQC then added count 8, ultimately concluding that in addition to the serious campaign violations, Judge Renke also violated state campaign finance laws by accepting an illegal campaign contribution from his father. However, despite the addition of this substantial charge, the JQC’s recommended penalty now is barely any different than it was two years ago, with the fine increasing only $20,000, to a total of $40,000. Given our original reservations with the discipline originally recommended by the JQC, we are satisfied that the addition of such egregious campaign finance violations merits a more substantial sanction, lest our warnings of more serious consequences go unheeded.
Given the history of this case before this Court, coupled with the previous warnings we have issued in published opinions regarding misconduct during judicial elections, the deliberate misrepresentations made by Judge Renke during his campaign, and the substantial violation of campaign finance laws, we find that removing Judge Renke from the bench is the only sanction appropriate for the serious misconduct established here.
Importantly, our previous opinions have cautioned against the exact type of misconduct that is before us in this case. Almost ten years ago, in In re Alley, 699 So.2d 1369 (Fla.1997), we faced similar alleged *494 violations on behalf of a candidate for judicial office; in that case, Judge Alley was charged with knowingly misrepresenting her qualifications and those of her opponent in her campaign literature, including mailers and newspaper advertisements. Id. at 1369. Among other violations, she claimed to have circuit court judicial experience, when in fact she had only served as a general master. Id. She also argued that her opponent had no circuit court judicial experience, when actually the opponent did have extensive experience serving in that capacity. Id. Finally, Judge Alley was charged with fostering an overly partisan tone in her election and creating false impressions as to her campaign endorsements. Id.
At the time we reviewed that case, we were constrained by the language of article V regarding our ability to modify the JQC’s proposed discipline. Id. at 1370. However, we expressed our frustration with the recommended discipline in that case, regarding violations similar to the ones we face today, stating, “we find it difficult to allow one guilty of such egregious conduct to retain the benefits of those violations and remain in office.” Id. Thus, we are especially troubled by Judge Renke’s conduct, given the explicit warnings regarding similar misconduct and the potential consequences we issued in In re Alley.
This Court continued to send loud and clear warnings concerning judicial election misconduct in In re McMillan, 797 So.2d 560 (Fla.2001). In that case, Judge McMillan, while a candidate for office, clearly indicated during his campaign that he would favor both the State and the police in court proceedings and also that he would side against the defense; he was further charged with making unfounded attacks on an incumbent judge and the local court system. Id. at 562. As did Judge Renke, Judge McMillan initially made a stipulation regarding these charges. The JQC then recommended a penalty of a public reprimand and six months’ suspension without pay; again, as in the instant case, we rejected this recommendation, remanding the case back to the JQC for further proceedings. Id. at 564. The JQC then amended the charges to add additional allegations, as it did with Judge Renke; in the case of Judge McMillan, this included charges of improper conduct once he was on the bench, including presiding over proceedings in a case in which he had a conflict of interest. Id.
On review, we agreed with the JQC’s findings of guilt on all charges, concluding that they were supported by clear and convincing evidence. Id. at 566. We also agreed with the JQC’s ultimate determination to remove Judge McMillan from the bench, especially in light of the additional charges concerning improper conduct once he became a judge. In our opinion we concluded:
This Court has emphasized that the object of disciplinary proceedings is not for the purpose of inflicting punishment, but rather to gauge a judge’s fitness to serve as an impartial judicial officer. See In re Kelly, 238 So.2d 565, 569 (Fla.1970). In making that determination, the Court has often pointed out that judges should be held to higher ethical standards than lawyers by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system. See In re Boyd, 308 So.2d 13, 21 (Fla. 1975). At the same time, the Court has recognized that the discipline of removal should not be imposed upon a judge unless the Court concludes that “the judge’s conduct is fundamentally inconsistent with the responsibilities of judi *495 cial office.” In re Graziano, 696 So.2d 744, 753 (Fla.1997).
In re McMillan, 797 So.2d at 571. In removing a judge from the bench and sounding this warning before Judge Renke’s campaign in 2002, we again were hoping to deter the kind of conduct we are faced with here, and putting all judicial candidates on notice that we would no longer tolerate such serious misconduct.
Unfortunately, we are compelled to repeat and emphasize the same warning we did ten years ago in In re Alley and more recently in In re McMillan:
[A]s we attempted to make clear in In re Alley, to allow someone who has committed such misconduct during a campaign to attain office to then serve the term of the judgeship obtained by such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins.
In re McMillan, 797 So.2d at 573. Today we make clear that those warnings cannot be ignored by those who seek the trust of the public to place them in judicial office.
In our decision to remove Judge Renke, we have concluded that the series of blatant, knowing misrepresentations found in Judge Renke’s campaign literature and in his statements to the press amount to nothing short of fraud on the electorate in an effort to secure a seat on the bench. Furthermore, as found by the JQC, the payments from Judge Renke’s father, though disguised as compensation, were clearly illegal donations to a judicial campaign in obvious violation of our state campaign finance laws. In essence, Judge Renke and his cohorts created a fictitious candidate, funded his candidacy in violation of Florida’s election laws, and successfully perpetrated a fraud on the electorate in securing the candidate’s election. Unlike the situation in In re Alley, we no longer feel restrained to permit someone who has successfully achieved judicial office by such blatant misconduct to hold onto this office.
Neither are we swayed by the mitigation proffered in this case. It is not enough to point to Judge Renke’s successes as a judge if he only attained that position through his own fraudulent and illegal campaign misconduct. It appears that the JQC may have decided that, as a matter of law, if a judge who has committed serious misconduct is serving adequately as a judge, he is presently fit to hold office. However, even accepting the JQC’s findings of fact on this issue, we hold that regardless of Judge Renke’s present abilities and reputation as a judge, one who obtains a position by fraud and other serious misconduct, as we have found Judge Renke did, is by definition unfit to hold that office.
In determining the discipline appropriate in cases of judicial wrongdoing, our obligation is first and foremost to the public and to our state’s justice system. Florida has chosen a nonpartisan election process for selecting judges, and conduct that substantially misleads the voting public and interferes with its right to make a knowing and intelligent decision as to a judicial candidate’s qualifications will simply not be tolerated in selecting members of the judiciary. Those who seek to assume the mantle of administrators of justice cannot be seen to attain such a position of trust through such unjust means. The JQC’s finding of guilt on the severe campaign finance improprieties evidenced here, when coupled with Judge Renke’s efforts to mislead the voting public as to his experience and qualifications to serve as judge, lead us to conclude that his conduct during his judicial campaign was “fundamentally inconsistent with the responsibilities of judicial office.” In re Gra- *496 ziano, 696 So.2d 744, 753 (Fla.1997). Accordingly, we conclude that Judge Renke is presently unfit to hold judicial office and removal is warranted.

CONCLUSION

We conclude that there is clear and convincing evidence in support of the findings of fact of the JQC on all charges. For the reasons stated above, John Renke III is hereby removed as a judge of the Sixth Judicial Circuit, effective upon this opinion becoming final. We direct that Renke pay the costs of these proceedings. See In re Hapner, 737 So.2d 1075, 1077 (Fla.1999). We remand this case to the JQC for a determination of the amount of such costs.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, QUINCE, and CANTERO, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which BELL, J., concurs.

. The text of Canon 7 A(3)(a) has been changed since the beginning of these proceedings against Judge Renke, but the modification does not affect this case, since Judge Renke was not accused of committing himself to a particular stance on an issue during his campaign. Canon 7(A)(3)(a) now provides that a candidate for judicial office "shall maintain the dignity appropriate to judicial office and act in a manner consistent with the impartiality, integrity, and independence of the judiciary, and shall encourage members of the candidate’s family to adhere to the same standards of political conduct in support of the candidate as apply to the candidate.” (Emphasis added.)

. This evidence would also appear to support the JQC findings as to Judge Renke's misrepresentations regarding his legal experience.

. To defend his belief that he could place the money in an account of his choosing, John Renke read aloud a provision from the settlement agreement's “Post-Signing Procedure,” which stated: "TOSCA's Insurer will, within 10 days after this agreement is signed by the attorneys, deposit in an interest-bearing account at a place and of a type to be designated by John K. Renke, II:(a) $98,000 for plaintiffs' attorneys fees incurred through the December 1998 mediation.”